UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEO RATTÉ, a minor, by his Next Friend, CLAIRE ZIMMERMAN; CLAIRE ZIMMERMAN, individually; and CHRISTOPHER RATTÉ, individually,

        Plaintiffs,

v.

MICHIGAN DEPARTMENT OF HUMAN SERVICES DIRECTOR MAURA CORRIGAN, in her official capacity; CITY OF DETROIT; OFFICER CELESTE REED, in her individual capacity; OFFICER HALL, in his individual capacity; OFFICER KNOX, in his individual capacity; CASEWORKER JANET WILLIAMS, in her individual capacity; CASEWORKER SUALYN HOLBROOK, in her individual capacity; CASEWORKER TURNER, in her individual capacity; CASEWORKER WILSON, in her individual capacity; CASEWORKER JANE DOE, in her individual capacity; CASEWORKER JOHN DOE, in his individual capacity; and JUDGE JUDY A. HARTSFIELD, in her individual capacity,

        Defendants.
_____/

Case No. 2:11-CV-11190

Hon. Avern Cohn

Mag. Michael J. Hluchaniuk

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

        Plaintiffs Leo Ratté, through his parent and Next Friend, Claire Zimmerman, and Claire Zimmerman and Christopher Ratté, in their individual capacities, by their counsel, hereby submit their Complaint against Defendants and state as follows:

PRELIMINARY STATEMENT

        1.    This is a civil rights action brought pursuant tfo 42 U.S.C. § 1983, by minor Leo Ratté and his biological parents, Claire Zimmerman and Christopher Ratté, for blatant violations of their United States Constitutional rights under the Fourteenth Amendment and Leo

Ratté's rights under the Fourth Amendment, by City of Detroit Police Officers, Michigan Department of Human Services Child Protection Case Workers, and Judge Judy A. Hartsfield of the Third Judicial Circuit Court. After an innocent mix-up regarding the partial consumption of a Mike's Hard Lemonade beverage at a Detroit Tigers baseball game at Comerica Park, seven-year-old Leo Ratté was promptly and unconstitutionally removed from the custody of his parents in the middle of the night and placed into a foster home. This improper action was made (1) absent any emergency or other exigent circumstances; (2) against medical evidence demonstrating Leo Ratté's blood did not contain any level of alcohol; (3) refusing to release Leo Ratté to his mother, Claire Zimmerman, even though she was not at the Tigers game and had no involvement whatsoever with the consumption of the lemonade; and (4) without a valid court order. In fact, the order used to remove Leo Ratté from the custody of his parents was invalid and issued according to a policy and practice put in place by Judge Judy A. Hartsfield, in concert with the City of Detroit Police and Department of Human Services, whereby complaints would be made to the court employee on duty who would then issue a pre-signed orders as a valid court orders. Accordingly, Plaintiffs seek a declaratory judgment from this Court finding that the Michigan emergency removal statute (M.C.L. § 712A.14(1)), with respect to the fact the statute does not require officers to consider placement of the child with the non-offending parent prior to a minor child's removal, and court rule (Mich. Ct. R. 3.963(A)) are unconstitutional on their face and as applied to Plaintiffs. Further that the policy put in place by Judge Judy A. Hartsfield for the issuance of purportedly valid court orders is unconstitutional. Plaintiffs also seek damages for the extreme emotional distress caused by Defendants' illegal conduct.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), because this case involves a federal question and federal law under 42 U.S.C. § 1983.

3. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), because the actions which give rise to the claims asserted in this Complaint arose in this district, and Defendants reside or are located within this district.

## PARTIES

4. Plaintiffs are members of a family who reside together in Ann Arbor, Washtenaw County, Michigan.

5. Plaintiff Leo Ratté is a minor child. During the events at issue in this litigation, he was seven years old. At the time of the filing of this First Amended Complaint, Leo Ratté is twelve years old.

6. Plaintiff Claire Zimmerman is Plaintiff Leo Ratté's biological mother. She is a professor of art history and architecture at the University of Michigan.

7. Plaintiff Christopher Ratté is Plaintiff Leo Ratté's biological father. He is a professor of classics at the University of Michigan.

8. Defendant City of Detroit ("Detroit" or the "City") is a municipal corporation organized and existing under the laws of the State of Michigan. The City of Detroit Police Department ("DPD" or the "Department") is the City's agent, created and authorized by the City to conduct acts as alleged herein.

9. Defendant Officer Celeste Reed ("Reed") was, at all times material to this action, an officer with the DPD, employed by the City. She is being sued in her individual capacity.

10. Defendant Officer Hall ("Hall") was, at all times material to this action, an officer with the DPD, employed by the City. He is being sued in his individual capacity.

11. Defendant Officer Knox ("Knox") was, at all times material to this action, an officer with the DPD, employed by the City. During the event at issue, Defendant Knox was the supervisor of Defendant Reed. Defendant Knox is being sued in his individual capacity.

12. Defendant DPD Officers Reed, Hall, and Knox are collectively referred to herein as the "Defendant Police Officers."

13. Defendant Director Maura Corrigan ("Defendant Corrigan") is the director of the Michigan Department of Human Services ("DHS"). She is being sued in her official capacity.

14. Defendant Caseworker Janet Williams ("Williams") was, at all times material to this action, a caseworker employed with the Wayne County office of DHS. She is being sued in her individual capacity.

15. Defendant Caseworker Sualyn Holbrook ("Holbrook") was, at all times material to this action, a caseworker employed with the Wayne County office of DHS. She is being sued in her individual capacity.

16. Defendant Caseworker Turner ("Turner") was, at all times material to this action, a caseworker employed with the Wayne County office of DHS. She is being sued in her individual capacity.

17. Defendant Caseworker Wilson ("Wilson") was, at all times material to this action, a caseworker employed with the Wayne County office of DHS. She is being sued in her individual capacity.

18. Defendant John Doe ("John Doe") was, at all times material to this action, a caseworker with the DHS. Caseworker John Doe's identity is presently unknown. Defendant John Doe is being sued in his individual capacity.

19. Defendant Jane Doe ("Jane Doe") was, at all times material to this action, a caseworker with the DHS. Caseworker Jane Doe's identity is presently unknown. Defendant Jane Doe is being sued in her individual capacity.

20. Defendant DHS caseworkers Williams, Holbrook, Turner, Wilson, John Doe, and Jane Doe are hereafter referred to collectively as the "DHS Defendants."

21. Defendant Judge Judy A. Hartsfield ("Judge Hartsfield) is a judge of the Third Judicial Circuit Court and was, at all times material to this action, a presiding judge with the Family Division, Juvenile Section ("Juvenile Court") of the Third Judicial Circuit Court. Defendant Judge Hartsfield is being sued in her individual capacity.

## FACTUAL ALLEGATIONS

22. On Saturday, April 5, 2008, Christopher Ratté brought his seven-year-old son, Leo Ratté, to Comerica Park in Detroit to attend a Detroit Tigers professional baseball game.

23. Christopher Ratté and Leo Ratté arrived at the game at approximately 3:50 pm, stopping at a concession stand before making their way to their assigned seats.

24. The sign located at the concession stand read: "Canned beer/Mike's Lemonade."

25. Christopher Ratté was unfamiliar with "Mike's Lemonade" or even "Mike's Hard Lemonade" and was unaware the lemonade contained alcohol.

26. There was no identification as to the nature of the type of lemonade. Specifically, absent from the sign was any indication the lemonade being sold was an alcoholic beverage.

27. Christopher Ratté purchased a beer for himself and then asked Leo Ratté whether he wanted a lemonade to drink.

28. Christopher Ratté did not pay attention to the label on the lemonade bottle and handed it to his son.

29. At approximately 6:30 pm, during the top of the 9th inning, Christopher Ratté was approached by a Comerica Park security guard.

30. The security guard picked up the partially full lemonade bottle sitting in front of Leo Ratté and questioned Christopher Ratté as to whether Christopher Ratté was permitting Leo Ratté to drink the lemonade.

31. To Christopher Ratté's surprise, the security guard informed Christopher Ratté the lemonade contained alcohol.

32. Christopher Ratté requested to see the lemonade bottle to view the label, but the security guard refused and told Christopher Ratté he must remain in his seat.

33. A large cluster of security guards assembled at the end of the row where Christopher Ratté and Leo Ratté were seated.

34. Christopher Ratté and Leo Ratté were then informed that they must accompany the security guards to a police substation located in Comerica Park.

35. Once Christopher Ratté and Leo Ratté arrived at the police substation, located within Comerica Park, Defendant Hall of the DPD questioned Christopher Ratté regarding his purchasing the lemonade for Leo Ratté.

36. During this time and at all future times, Christopher Ratté responded he had no idea the lemonade was alcoholic. He further stated that if he had known the drink contained alcohol he would not have given it to his son.

37. Christopher Ratté again requested Defendant Hall to permit him to view the lemonade bottle.

38. Upon reading the label, which had a small notation stating the drink contained five percent alcohol, Christopher Ratté again expressed his surprise to Defendant Hall regarding this discovery.

39. Defendant Hall then informed Christopher Ratté and Leo Ratté that Leo Ratté must submit to examination by the substation medical staff. Christopher Ratté and Leo Ratté proceeded to the medical clinic where two nurses conducted a cursory examination of Leo Ratté.

40. Although the medical examination resulted in no findings that Leo Ratté suffered any adverse reactions from consuming the lemonade, against Christopher Ratté's will, Leo Ratté was forced by Defendant Hall to travel in an ambulance to Children's Hospital in Detroit for further examination.

41. During this time, Christopher Ratté contacted his wife, Claire Zimmerman, on his cell phone and informed her that their son, Leo Ratté, was being taken to the hospital for examination.

42. At approximately 7:00 pm, the ambulance arrived at Children's Hospital. Leo Ratté was placed into an examination room, blood samples were taken, and Leo Ratté was examined by Dr. Sethuraman.

43. Shortly thereafter, Ms. Zimmerman arrived at the hospital.

44.     Following his physical examination of Leo Ratté, Dr. Sethuraman concluded Leo Ratté appeared "normal," that "the alcohol level was negative," and "decided to medically clear him." (Copy of Medical Report attached as Exh. A).

45.     At approximately 7:15 pm, Christopher Ratté was taken into a separate room by Defendant Reed, a DPD officer from the Child Abuse Division.

46.     Defendant Reed questioned Christopher Ratté at length and requested Christopher Ratté provide a signed statement, to which Christopher Ratté obliged.

47.     Prior to receiving the results of Leo Ratté's blood test and armed with information that Christopher Ratté was unaware the lemonade contained alcohol, Defendant Reed informed Christopher Ratté that Leo Ratté was to be transferred to the DHS.

48.     Even though Leo Ratté's mother, Claire Zimmerman, had no involvement with the activities at the Tigers game, was available to take custody, and vehemently demanded that her son be released to her, Defendant Reed refused to release Leo Ratté to her or her husband, Christopher Ratté.

49.     Defendant Reed's only explanation was that her supervisor, Defendant Knox, was "pushing this case to impress her new boss."

50.     Defendant Reed then filed a fraudulent complaint (the "Complaint") with the Intake Unit of the Wayne County Juvenile Detention Center, falsely alleging she [Defendant Reed] "observed [Leo Ratté] to be intoxicated." (Copy of JC02 Complaint attached as Exh. B).

51.     The Complaint made no mention of the blood alcohol test given to Leo Ratté, which resulted in a conclusive showing that no alcohol was detected in Leo Ratté's bloodstream, or the physical examination conducted by Dr. Sethuraman.

52. The Complaint did not allege Leo Ratté would be in imminent harm if released to his father.

53. The Complaint did not allege Leo Ratté would be in imminent harm if released to his mother, who was not involved in the mix-up regarding the lemonade.

54. Further, upon information and belief, the medical professionals at Children's Hospital were never even interviewed by Defendant Reed prior to filing the Complaint.

55. Included with the fraudulent Complaint was an equally improper Petition for Child Protective Proceedings (the "Petition") seeking the issuance of an order removing Leo Ratté from the custody of his parents. (Copy of Petition attached as Exh. C).

56. The Complaint and Petition, purportedly submitted to the Juvenile Court, were instead submitted to the individual on duty at the Juvenile Court to process and compile the requests.

57. The individual on duty at the Juvenile Court then issued an Order to Place/Consent to Emergency Treatment Pending Preliminary Hearing (the "Order") regarding Leo Ratté. (Copy of Order attached as Exh. D and Copy of Deposition of Althea Alexander as Designated Representative for the Third Judicial Circuit Court Family Division Juvenile Section Pursuant to Fed. R. Civ. P. 30(b)(6) attached as Exh. E).

58. The Order held "there are reasonable grounds for removal of the minor(s) from the parent" because "there is probable cause to believe that Father was said to have bought his seven year old son an alcoholic beverage while at the baseball game. According to officer Reed, child was observed to be under the influence of alcohol."

59. On its face, the Order appeared to be issued by the presiding judge, Defendant Judge Hartsfield and contained her signature.

60. In fact, the Order was pre-signed by Defendant Judge Hartsfield prior to Saturday, April 5, 2008 together with numerous other blank orders that were to be filled in by the individual on duty at the Juvenile Court and which granted any relief requested by the police.

61. Defendant Judge Hartsfield did not review the Order or speak with the individual on duty at the Juvenile Court before issuance of the Order.

62. Instead, Defendant Judge Hartsfield put in a place a process and procedure whereby the individual on duty at the Juvenile Court was mandated to fill-in partially completed, pre-signed orders of removal upon the filing of a complaint by the police and to issue such orders as valid court orders to place minors in the custody of DHS.

63. Per this process and procedure put in place by Defendant Judge Hartsfield, the Order, which appeared facially valid, was issued as if valid even though, in fact, it was issued without judicial review and in violation of Michigan law and the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution.

64. Defendant Judge Hartsfield deliberately represented the Order as valid and properly authorized when, in fact, the Order was invalid and not properly authorized under Michigan law.

65. Plaintiffs were never served with the Order and only later obtained a copy of the Order from DHS Defendants and Defendant Police Officers through discovery in this litigation and until shortly before the Plaintiff's request for leave to file their First Amended Complaint, were unaware of the illegal and unconstitutional procedures which caused the Order to be issued.

66. Later that evening, at approximately midnight, Defendants Jane Doe and John Doe from the Wayne County Department of Human Services arrived at Children's Hospital.

67. Christopher Ratté and Claire Zimmerman were then informed that Leo Ratté would not be permitted to stay overnight at the hospital and would be taken by DHS to its office at 2929 Russell Street pending placement.

68. At that time, Defendants Reed, Jane Doe and John Doe led Plaintiffs to believe that Leo Ratté would be released into the custody of his aunts the following morning, once they arrived from out of town. Subsequently, similar assurances were given by Defendant Turner.

69. At approximately 7:45 am on April 6, 2010, after driving all night from Massachusetts, Leo Ratté's aunts arrived at DHS.

70. Contrary to prior assurances, the aunts were informed by Defendant Wilson that they would not be allowed to see or speak with Leo Ratté.

71. After repeated conversations with Defendant Reed and Defendant Williams, the aunts were told that if they checked into a hotel room, Leo Ratté would be placed into their custody.

72. However, when the aunts returned from checking into the hotel, they were informed that Leo Ratté had already been placed into foster care.

73. Despite numerous calls to DHS from Christopher Ratté and Claire Zimmerman, they were constantly placed on hold and were unable to speak to anyone from DHS regarding the situation.

-11-

74. It was not until approximately 2:00 pm on April 6, 2010, that Christopher Ratté finally managed to speak with Defendant Turner's supervisor, Defendant Holbrook.

75. Defendant Holbrook informed Christopher Ratté that Leo Ratté would not be released to his aunts and that no one from the family would be allowed to see Leo Ratté.

76. Defendant Holbrook further informed Christopher Ratté that he and his wife would only be allowed to speak with Leo Ratté as permitted by the foster parents.

77. During the remainder of the day, Christopher Ratté and Claire Zimmerman had, at a minimum, three further telephone conversations with Defendant Holbrook. During each such conversation, Christopher Ratté and Claire Zimmerman were again informed that they were not permitted to see or speak with Leo Ratté.

78. It was not until Monday, April 7, 2008, that Leo Ratté was finally released into the custody of his mother, Claire Zimmerman. Such decision did not occur until Christopher Ratté agreed to temporarily move out of the family home and not see or speak with his son, Leo Ratté, unless supervised by Claire Zimmerman.

79. Shortly thereafter, all pretrial charges against Christopher Ratté were dropped and he was permitted to return home to his family.

80. Plaintiffs suffered extreme stress, anxiety, and trauma from the conduct of Defendants, as alleged herein.

81. Defendants were acting under the color of law at all times relevant to this complaint.

82. The acts of Defendant Police Officers were done pursuant to the policy, practice and custom of the City and the Police Department in assisting DHS Defendants in

removing children from their parents without exigent circumstances or imminent danger, and without the consideration of whether or not a different parent or relative is available.

83. According to local attorneys and child advocacy experts familiar with child advocacy proceedings, the City of Detroit Police Department maintains a general and ongoing practice of assisting DHS case workers in removing children, in absence of a valid court order, without regard to whether children are in imminent danger of harm or other exigent circumstances exist.

84. Judge Hartsfield created and maintained a policy, in concert with the City of Detroit Police Department and DHS, which created an illegal and unconstitutional procedure whereby an individual placed on duty at the court would issue purportedly valid court orders by filling in pre-signed, blank form orders which were to be filled in with the relief requested by the Police Department and/or the DHS by the individual on duty.

85. The City, Defendant Police Officers, the DHS Defendants, and Judge Hartsfield, were indifferent to Plaintiffs' constitutional rights.

## COUNT I
## DECLARATORY JUDGMENT

86. Plaintiffs incorporate by reference all prior allegations of this Complaint into this Count.

87. Mich. Ct. R. 3.963(A) is unconstitutional on their face, and as applied to Plaintiffs, because the rule does not require, in the absence of a valid court order, that removal of a child occur only under "exigent circumstances" or when there is "imminent danger," as required by the guarantees of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

88.     M.C.L. § 712A.14(1) and Mich. Ct. R. 3.963(A) are unconstitutional on their face and as applied to Plaintiffs, because in the absence of a valid court order, neither the statute nor the rule requires officers to consider placement of the child with the non-offending parent prior to a minor child's removal, in violation of the Fourteenth Amendment to the United States Constitution.

89.     The policy put in place by Judge Hartsfield, in concert with the City of Detroit Police Officers and DHS, whereby purportedly valid court orders were issued by an individual on duty at the Juvenile Court who merely filled-in pre-signed orders at the request of City of Detroit Police Officers and/or DHS workers, is unconstitutional and in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

90.     Plaintiffs seek a declaratory judgment finding that M.C.L. § 712A.14(1), Mich. Ct. R. 3.963(A), and the policy of Judge Hartsfield are unconstitutional and in violation of the Fourteenth Amendment to the United States Constitution.

COUNT II
FOURTEENTH AMENDMENT VIOLATION
SUBSTANTIVE DUE PROCESS

91.     Plaintiffs incorporate by reference all prior allegations of this Complaint into this Count.

92.     Defendants, by their unlawful acts and acting under the color of Michigan law, violated Christopher Ratté and Claire Zimmerman's right to the care, custody and association with their child, Leo Ratté, in violation of their Fourteenth Amendment substantive due process right to family integrity.

93.     Defendants, by their unlawful acts and acting under the color of Michigan law, deprived Leo Ratté of his right to receive such care, custody and association with his

parents, in violation of his Fourteenth Amendment substantive due process right to family integrity.

94. Defendants, by their illegal procedures and acting under the color of Michigan law, violated Leo Ratté, Christopher Ratté and Claire Zimmerman's substantive right to due process under the Fourteenth Amendment.

95. As further alleged herein, all Plaintiffs suffered such deprivations with respect to Defendants' removal of Leo Ratté from the custody of his parents and placement with a foster family.

## COUNT III
## FOURTEENTH AMENDMENT VIOLATION
## PROCEDURAL DUE PROCESS

96. Plaintiffs incorporate by reference all prior allegations of this Complaint into this Count.

97. The Fourteenth Amendment requires government provide procedural due process before making a decision to infringe upon a person's life, liberty, or property interest.

98. Defendants, by their unlawful acts and procedures and acting under the color of Michigan law, violated Claire Zimmerman's right to family integrity, without providing constitutionally adequate process.

99. Defendants, by their unlawful acts and procedures and acting under the color of Michigan law, violated Christopher Ratté's rights to family integrity and liberty, without providing constitutionally adequate process.

100. Defendants, by their unlawful acts and procedures and acting under the color of Michigan law, violated Leo Ratté's rights to family integrity and liberty, without providing constitutionally adequate process.

101. Plaintiffs were simply not afforded any process prior to the removal of Leo Ratté from his parents' custody, in the absence of a valid court order and without regard to whether Leo would face imminent harm if he was released to one or both of his parents, or to his aunts.

COUNT IV
FOURTH AMENDMENT VIOLATION
<u>UNLAWFUL SEIZURE</u>

102. Plaintiffs incorporate by reference all prior allegations of this Complaint into this Count.

103. Defendants, by their acts and acting under the color of Michigan law, violated Leo Ratté's rights against unreasonable seizures under the Fourth Amendment to the United States Constitution.

104. Leo Ratté suffered such deprivations as a result of his removal from the custody of his parents, his being taken into protective custody, and his placement into a foster home.

105. The unlawful seizure of Leo Ratté by Defendants was done without a duly authorized court order, without probable cause, and was not justified by any exigent circumstances, in violation of the Fourth Amendment to the United States Constitution.

**PRAYER FOR RELIEF**

Plaintiffs request that this Court grant the following:

1. Enter a declaration that M.C.L. § 712A.14(1), with respect to the fact the statute does not require officers to consider placement of the child with the non-offending parent prior to a minor child's removal, and Mich. Ct. R. 3.963(A) violate the Fourteenth Amendment to the United States Constitution and cannot be enforced by any governmental entity or agency;

      2.      Enter a declaration that the policy put in place by Judge Hartsfield for issuing purportedly valid court orders violates the Fourteenth Amendment of the United States Constitution and any use of such court orders must cease immediately;

      3.      Enter a declaration that Plaintiffs' Fourteenth Amendment rights and Leo Ratté's Fourth Amendment rights were violated;

      4.      Award Plaintiffs' appropriate damages;

      5.      Award Plaintiffs' reasonable costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

      6.      Award all other relief that is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all issues so triable.

                                      Respectfully submitted,

                                       /s/ Abraham Singer
Abraham Singer (P23601)
*singera@pepperlaw.com*
Alice J.P. Rhee (P75123)
*rheea@pepperlaw.com*
Cooperating Attorneys, American Civil Liberties Union Fund of Michigan
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075-1505
248.359.7300

Michael J. Steinberg (P43085)
msteinberg@aclumich.org
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
313.578.6814

Amy L. Sankaran (P70763)
aharwell@umich.edu
Cooperating Attorney, American Civil Liberties Union Fund of Michigan
625 S. State Street
Ann Arbor, MI 48109
734.764.7787

*Attorneys for Plaintiffs*

DATED: December 11, 2012

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LEO RATTÉ, a minor, by his Next Friend, CLAIRE ZIMMERMAN; CLAIRE ZIMMERMAN, individually; and CHRISTOPHER RATTÉ, individually,

   Plaintiff,

v.

MICHIGAN DEPARTMENT OF HUMAN SERVICES DIRECTOR MAURA CORRIGAN, et al.,

   Defendants.

Case No. 2:11-cv-11190

Hon. Avern L. Cohn

---

### CERTIFICATE OF SERVICE

   I hereby certify that on the 11th day of December, 2012, I caused a copy of the foregoing **First Amended Complaint and Demand For Jury Trial and this Certificate of Service** to be electronically filed with the United States District Court, Eastern District of Michigan, and notice will be sent by operation of the Court's electronic filing system to all ECF participants.

   Respectfully submitted,

   /s/ Abraham Singer
   Abraham Singer (P23601)
   *singera@pepperlaw.com*
   Alice J.P. Rhee (P75123)
   rheea@pepperlaw.com
   Cooperating Attorneys, American Civil Liberties Union Fund of Michigan
   PEPPER HAMILTON LLP
   100 Renaissance Center, Suite 3600
   Detroit, MI 48243-1157
   313.259.7110

Dated:  December 11, 2012     Attorneys for Plaintiffs

#16832736 v2 (999960.42226)