UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEO RATTÉ, a minor by his Next Friend,
CLAIRE ZIMMERMAN; CLAIRE
ZIMMERMAN; and CHRISTOPHER
RATTÉ,

                 Plaintiffs,                             Case No: 11-11190

vs.                                             HON. AVERN COHN

MAURA CORRIGAN; CITY OF DETROIT;
CELESTE REED; SCOTT HALL; RICHARD
KNOX; SUALYN HOLBROOK; CHERITA
TURNER-ROYSTER; and JUDY A.
HARTSFIELD,

                 Defendants.
_____/

## MEMORANDUM AND ORDER SEVERING COUNT I AGAINST DEFENDANT CORRIGAN AND DENYING DEFENDANT HARTSFIELD'S MOTION TO DISMISS (Doc. 63) AND GRANTING DEFENDANT'S HOLBROOK'S AND TURNER'S MOTION FOR SUMMARY JUDGMENT (Doc. 64)

## I. INTRODUCTION

This is a civil rights case under 42 U.S.C. § 1983.  The claims arise out of an incident at Comerica Park where the plaintiff father inadvertently gave his 7-year-old plaintiff son a "Mike's Hard Lemonade," an alcoholic beverage, at a Tiger game.  A series of events then took place which resulted in the plaintiff son being placed in foster care over a weekend.

Plaintiffs are Christopher Ratté and Claire Zimmerman, the plaintiff child's parents, and minor child Leo Ratté.  Plaintiffs are suing:

The City of Detroit and Detroit Police Department Officers Celeste Reed, Scott Hall,

and Richard Knox (the City of Detroit defendants)[1];

Maura Corrigan (Corrigan) in her official capacity as Director of the Michigan Department of Human Services (DHS);

Sualyn Holbrook (Holbrook) in her individual capacity as former Placement Resource 24-Hour Unit Supervisor in the Wayne County office of the Michigan DHS;

Cherita Turner-Royster (Turner-Royster) in her individual capacity as former Child Protective Services Supervisor in the 24-Hour Unit of the Wayne County office of the Michigan DHS; and

Third Judicial Circuit Court Judge Judy Hartsfield (Hartsfield) in her individual capacity.[2]

The first amended complaint (Doc. 51) is in four counts:

| | |
|---|---|
| Count I | Declaratory Judgment that Mich. Ct. R. 3.963(A) and Mich. Comp. Laws § 712A.14(1) are facially unconstitutional, and unconstitutional as applied to plaintiffs |
| Count II | Fourteenth Amendment Violation – Substantive Due Process (All defendants) |
| Count III | Fourteenth Amendment Violation – Procedural Due Process (All defendants) |
| Count IV | Fourth Amendment Violation – Unlawful Seizure (All defendants) |

Now before the Court is Hartsfield's motion to dismiss (Doc. 63). Also before the Court is defendants Corrigan's, Holbrook's and Turner-Royster's motion for summary judgment (Doc. 64). The Court heard oral argument on the motions on Wednesday,

---

[1] Due to the pending bankruptcy case involving the City, the Court stayed the case as it relates to the City, Reed, Hall and Knox, including their pending motion for summary judgment. *See* (Doc. 68). In addition, the Court bifurcated the claims against the City and its officers from the claims against the remaining defendants. *See* (Doc. 72).

[2] Plaintiffs also sued Janet Williams, Wilson, and two "John Doe" defendants associated with the Michigan DHS. Plaintiffs voluntarily dismissed these defendants under Fed. R. Civ. P. 41(a)(1). *See* (Doc. 71).

November 13, 2013.

At the hearing, the Court expressed its concern whether it has discretion to issue a declaratory judgment and required the parties to provide supplemental briefing on the matter. The parties have submitted their supplemental briefs (Docs. 84, 85). For the reasons stated on the record at the hearing, count I of the first amended complaint seeking a declaratory judgment against Corrigan is SEVERED from the remaining claims. The Court will issue a separate written decision relating to count I.

For the reasons that follow, Hartsfield's motion to dismiss is DENIED and Holbrook's and Turner-Royster's (the DHS defendants) motion for summary judgment is GRANTED. The claims against the DHS defendants are DISMISSED. The case proceeds against Hartsfield in regards to counts II through IV.

## II. BACKGROUND

On Saturday, April 5, 2008, Christopher Ratté (Ratté), a classical archeology professor at the University of Michigan, attended a Tigers game at Comerica Park with his seven year-old son Leo. Before arriving at their seats, Ratté purchased Leo a Mike's Hard Lemonade not knowing that it contained alcohol, believing it to be an ordinary lemonade. Ratté testified at his deposition that he would not have given the drink to Leo had he known that it contained alcohol.

Ratté and Leo took the beverage with them to their seats at which time Leo drank some of it. After Leo drank some of the beverage, Ratté and Leo were approached by Sean Davidson (Davidson), a Comerica Park security person who observed Leo with the beverage. Davidson generated an incident report explaining what happened next. In the report, Davidson wrote:

3

After being informed of a man possibly giving alcohol to a boy I observed them for some time. Section 124 row 26. I observed the child drink from the Mike's Hard Lemonade bottle. I approached the adult guest and asked if he was giving alcohol to the child. He claimed to not know the drink was alcoholic. I then confiscated the Mike's Hard Lemonade bottle the boy drank from and called dispatch for assistance. When help came the man and child were escorted to police detail.

Police officers and medical personnel were present at the sub-station. Leo was examined by two nurses. It was noted that Leo had nausea and urination, but that he was alert and awake, asking questions, and attentive.

After being examined by the nurses at the sub-station, Leo was taken to Children's Hospital by ambulance. Ratté originally objected to Leo being taken to the hospital, but he eventually consented. Ratté rode in the ambulance with Leo and the medical personnel. There were no police officers in the ambulance.

When the ambulance arrived at Children's Hospital, Leo was examined by a resident physician and Dr. Usha Sethuraman, the attending physician, while Ratté was present. In a medical report Sethuraman stated that Leo

> was found drinking a Mike's Hard Lemonade, which apparently contains 5% alcohol. Dad claims that he did not know that this was an alcoholic beverage. According to the report that I got from the physician at the scene is [sic] the child probably took about three-quarters of a bottle, close to about 10 to 12 ounces. He had a little bit of nausea at the site. Accu-Chek done at the site was normal. Ingestion was somewhere between 4 and 6:30, Dad is not clear about the time. After that, his nausea has gotten better. Currently he is asymptomatic.

Sethuraman's report noted that there was no trace of alcohol in Leo's blood.

Before Leo's blood test results were returned, Detroit Police Department Officer Celeste Reed (Reed) arrived at Children's Hospital. Reed says she observed Leo to be "flushed in the face" and "giggling." This was Reed's first contact with Leo and his parents as she was not at the ballpark. Reed in her deposition stated that she spoke with her

4

sergeant, Richard Knox, and explained to him what she saw.  Reed then left the hospital

while Ratté and Leo were still there and drove to the DHS facility on 2929 Russell Street,

which is also the Child Abuse Unit of the Detroit Police Department (the Russell Street

facility).  At the Russell Street facility, Reed filled out a Complaint and Request for Action[3]

and faxed one copy to the Family Division of the Wayne County Circuit Court (the family

court) located at a separate building, and another copy to DHS, which is also in a separate

building.  On the Complaint and Request for Action form, Reed checked the box requesting

"an order be issued to take the child into protective custody pending a preliminary hearing

pursuant to MCR 3.963(B)."  Reed said in the complaint:

> On Saturday, April 5, 2008, at approximately 7:30 p.m., Officer Hall from Central
> District, working Comerica Park, Tiger game, was notified by security that the
> Defendant Christopher Ratte W/M/47 purchased a Mike's Hard Lemonade & gave
> it to [Leo] to drink. [Leo] drank approximately 3/4 of the bottle of Lemonade.  Medic
> 31 . . . conveyed [Leo] to Children's Hospital for medical treatment. [Leo] was seen
> by Dr. Sethuraman . . . , stable condition. [I] observed [Leo] to be intoxicated.

Reed did not return to Children's Hospital after completing and submitting the Complaint

and Request for Action.

After the Complaint and Request for Action was submitted to DHS and the family

court, Janet Williams (Williams), a DHS employee who is no longer a party to this action,

prepared a Petition for Child Protective Proceedings[4].  Williams faxed the form to the family

court for review.  In the petition, Williams requested that Leo be removed from the custody

of his parents, plaintiffs Ratté and Zimmerman.

Subsequent to the family court receiving the Complaint and Request for Action and

---

[3] The Complaint and Request for Action is attached as Exhibit A.

[4] The Petition for Child Protective Proceedings is attached as Exhibit B.

Petition for Child Protective Proceedings, and while Ratté and Leo were still at Children's Hospital,[5] an Order To Place/Consent To Emergency Treatment Pending Preliminary Hearing[6] was docketed by the family court, bearing Judge Hartsfield's signature.  It was later learned that what was docketed was not actually signed by Hartsfield at the time it was docketed, and that she did not have any involvement in what was docketed.  Rather, Hartsfield had left forms of pre-signed orders at the family court and a probation officer on duty after hours filled in the form and then filed them with her signature.

The form order stated:

It appears to the Court upon the filing of a petition, together with further proofs required by the Court, that there are reasonable grounds for removal of the minor(s) from the parent, guardian, or legal custodian by this Court in compliance with MCL 712A.2, MCR 3.933(B), MCR 3.963(B), or MCR 3.983 because conditions or surroundings of the child(ren) are such as to endanger the health, safety, or welfare of the child(ren) and it is contrary to the welfare of the child(ren) to remain in the home because there is probable cause to believe that **Father was said to have bought his seven year old son a [sic] alcoholic beverage while at the baseball game.  According to officer Reed, child was observed to be under the influence of alcohol.  Child taken to Children's Hospital.**

**The child(ren) is placed with DHS for care and supervision pending the next hearing.**

The form order also stated that a preliminary hearing was set to take place between April 5th and 11th, 2008.

After the form order was filed, two DHS employees who are not parties to this action drove to Children's Hospital in a van to pick up Leo and take him to the Russell Street facility.  While Ratté was still present with Leo at the hospital, the DHS employees took

---

[5] At some point, Leo's mother, Zimmerman, also arrived at the hospital.

[6] The Order To Place/Consent To Emergency Treatment Pending Preliminary Hearing is attached as Exhibit C.

custody of Leo, placed him in the van, and drove him to the Russell Street facility. Ratté and Zimmerman followed in a different vehicle. Defendant Turner-Royster was the supervisor for DHS at the Russell Street facility on Saturday night. Defendant Holbrook was the supervisor for DHS on Sunday.

Leo was taken inside the Russell Street facility and placed in a room with a television and a couch. He stayed in this room Saturday night and slept on the couch.

Plaintiffs say that at the hospital they were told by Reed and DHS employees who are not parties to this action that Leo would be placed with his aunt, Catherine Ratté (Catherine), a registered foster parent in Wisconsin, and her sister Felicity Ratté (Felicity) if they arrived at the Russell Street facility by Sunday morning. Catherine and Felicity drove to Michigan from Massachusetts and arrived at the Russell Street facility around 9:00 a.m.

However, when they arrived Catherine and Felicity were ultimately told by both Holbrook and Turner-Royster that Leo would not be released to their custody because they were from out of state and a comprehensive background check was required.

Some time before noon on Sunday morning, Leo was picked up from the Russell Street facility and taken to a foster home in Warren, Michigan. Leo remained in foster care all day Sunday and through the night.

The next morning, on Monday, April 7, 2008, a preliminary hearing was held before a referee of the family court. Leo was represented by a guardian ad litem. His parents were represented by separate counsel.

The referee issued an Order After Preliminary Hearing bearing Judge Hartsfield's signature which concluded that it was contrary to Leo's welfare to remain in the home with Ratté and Zimmerman because:

7

> THE CHILD WAS OBSERVED INTOXICATED AT A BALLGAME AFTER HAVING CONSUMED ALCOHOL [sic] BEVERAGE PURCHASED BY THE LEGAL FATHER. THE CHILD WAS TRANSPORTED TO CHILDREN[']S HOSPITAL FOR TREATMENT. THE FATHER FAILED TO PROTECT THE CHILD. THE CHILD IS AT RISK OF HARM IN THE CARE AND CUSTODY OF THE LEGAL FATHER.

The referee determined that removal from the home was the only option that would adequately safeguard Leo from risk of harm. However, the referee added an additional condition that allowed Leo to be returned to his home as long as Ratté moved out of the home:

> THE CASEWORKER TO COMPLETE INVESTIGATION, FILE AMENDED PETITION IF APPROPRIATE. THE LEGAL FATHER IS TO VACATE THE HOME PENDING THE COMPLETION OF INVESTIGATION. THE CHILD IS TO BE RETURNED TO THE HOME. WASHTENAW COUNTY DHS IS COMPLETE HOME STUDY. THE [LAWYER GUARDIAN AD LITEM] IS TO INTERVIEW THE CHILD. MAKE REASONABLE EFFORTS FINDINGS AT NEXT HEARING. SUPERVISED PARENTING TIME FOR THE FATHER.

The referee adjourned the preliminary hearing until April 10, 2008 for further DHS investigation. At the continued preliminary hearing on April 10, 2008, it was determined that Leo could be returned his home with Ratté present. The Petition for Child Protective Proceedings was therefore dismissed.

This action was filed approximately three years later on March 24, 2011.

### III. HARTSFIELD'S MOTION TO DISMISS

**A. Legal Standards**

**1. Fed. R. Civ. P. 12(b)(1)**

Hartsfield first moves to dismiss the first amended complaint against her based on the *Rooker-Feldman* doctrine. This is a facial attack to the court's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). A Fed. R. Civ. P. 12(b)(1) motion seeks dismissal for a court's lack of subject matter jurisdiction. The motion may be based on

8

either a facial attack or a factual attack on the allegations of the complaint. *Tri-Corp Mgmt. Co. v. Praznik*, 33 F. App'x 742, 745 (6th Cir. 2002). Where, as here, subject matter jurisdiction is facially attacked, the court must take all material allegations in the complaint as true and construe them in a light most favorable to the nonmoving party. *United States v. A.D. Roe. Co.*, 186 F.3d 717, 721–22 (6th Cir. 1999).

### 2. Fed. R. Civ. P. 12(b)(6)

Alternatively, Hartsfield moves to dismiss the first amended complaint under Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint. To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir. 2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for

9

relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

## B. Analysis

Hartsfield argues that the claims in the first amended complaint must be dismissed against her for four reasons: (1) the *Rooker-Feldman* doctrine strips the Court of its subject matter jurisdiction; (2) Hartsfield is absolutely immune; (3) to the extent that absolute immunity is inapplicable, qualified immunity bars plaintiffs' claims; and (4) the statute of limitations has run on plaintiffs' claims against Hartsfield. The Court discusses, and ultimately rejects, each of these arguments in turn.

### 1. *Rooker-Feldman* does not bar plaintiffs' claims against Hartsfield

Hartsfield argues that the true source of plaintiffs' alleged injuries is the state court form order bearing her signature initially removing Leo from his parents' custody. The Court disagrees. Plaintiffs are not challenging the form order or asking the Court to review it in any way. The "source of injury" alleged in plaintiffs' first amended complaint is Hartsfield's practice of allowing removal of children from their homes without judicial review by providing what is in effect a pre-signed form order to non-judicial officers.

### 2. Hartsfield does not have judicial immunity

Next, Hartsfield argues that she is entitled to absolute judicial immunity. Because she was acting administratively, the Court disagrees.

The Supreme Court has long recognized that, "[a]lthough unfairness and injustice to a litigant may result on occasion," a "judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Mireles v. Waco*, 502 U.S. 9, 10 (1991) (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1872) (internal quotation mark omitted)). To carry out their

10

judicial actions without fear of personal consequences, judges are entitled to absolute judicial immunity from § 1983 civil suits requesting damages. *Pierson v. Ray*, 386 U.S. 547, 553–54 (1967); *Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir. 1997).

Absolute judicial immunity can only be overcome in two circumstances. First, "a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity." *Mireles*, 502 U.S. at 11 (citing *Forrester v. White*, 484 U.S. 219, 227–29 (1988); *Stump v. Sparkman*, 435 U.S. 349, 360 (1978)). Second, "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12 (citations omitted).

Here, Hartsfield is not entitled to absolute judicial immunity because the acts complained of in the first amended complaint are not judicial acts. The Supreme Court has "made clear that whether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Mireles*, 502 U.S. at 12 (quoting *Stump*, 435 U.S. at 362) (internal quotation marks and citation omitted). In other words, courts "look to the particular act's relation to a general function normally performed by a judge." *Id.* at 13.

Hartsfield argues that the nature of the act she performed which plaintiffs complain of–the signing of a piece of paper that eventually became an order–is a judicial action normally performed by a judge. Looking at the allegations in the first amended complaint, however, shows that Judge Hartsfield's alleged involvement in the scheme of things involved non-judicial actions:

60.    In fact, the Order was pre-signed by Defendant Judge Hartsfield prior to

Saturday, April 5, 2008 together with numerous other blank orders that were to be filled in by the individual on duty at the Juvenile Court and which granted any relief requested by the police.

61.    Defendant Judge Hartsfield did not review the Order or speak with the individual on duty at the Juvenile Court before issuance of the Order.

62.    Instead, Defendant Judge Hartsfield put in place a process and procedure whereby the individual on duty at the Juvenile Court was mandated to fill-in partially completed, pre-signed orders of removal upon the filing of a complaint by the police and to issue such orders as valid court orders to place minors in the custody of DHS.

63.    Per this process and procedure put in place by Defendant Judge Hartsfield, the Order, which appeared facially valid, was issued as if valid even though, in fact, it was issued without judicial review and in violation of Michigan law and the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution.

(Doc. 51 at 10).

It is not Hartsfield's actions in signing the form of order that plaintiffs complain about. Rather, it is Hartsfield's actions in putting in place a policy which allowed a pre-signed removal form to be filled in and docketed by non-judicial personnel, without judicial review, for a petition submitted to the family court after normal business hours. These actions, if true, are administrative. Hartsfield essentially signed pieces of paper that had no vitality until a third party–in this case a probation officer–filled in certain information on the paper. At the time the form of order was signed by Hartsfield, there were no parties before the court nor were there any active child custody proceedings. Her actions therefore could not have been "judicial acts."

The central question in determining whether an act is "judicial" as opposed to "administrative" is whether the act resolves a dispute between the parties who have invoked the jurisdiction of the court. *Forrester v. White*, 484 U.S. 219, 227 (1988). In

12

*Morrison v. Lipscomb*, 877 F.2d 463, 466 (6th Cir. 1989), the Sixth Circuit explained that "simply because rule making and administrative authority has been delegated to the judiciary does not mean that acts pursuant to that authority are judicial."  In *Morrison*, the Sixth Circuit held that a state court judge's issuance of a moratorium on the issuance of writs of restitution was a non-judicial act because it was an order not connected to any particular litigation.  *Id.*  The Sixth Circuit stated:

> We hold that judicial immunity does not apply.  Any time an action taken by a judge is not an adjudication between parties, it is less likely that the act is a judicial one. [Judge] Shakoor's moratorium was a general order, not connected to any particular litigation.  The order did not alter the rights and liabilities of any parties but, rather, instructed court personnel on how to process the petitions made to the court.  This case differs from an adjudication in that a litigant offended by a judicial act can, in the vast majority of cases, appeal the court's decision to a higher court; here, no direct appeal is available, making the absence of judicial liability far less reasonable. . . We hold, then, that the Shakoor order was an administrative, not judicial, act and that absolute immunity does not apply.

*Id.*

Hartsfield's actions here are analogous to Shakoor's actions determined to be administrative in *Morrison*.  Hartsfield's pre-signed "order" was not "connected to any particular litigation."  Instead, a pre-signed paper when filled out by a probation officer and submitted to the family court after hours was used to deprive Leo and his parents from any meaningful judicial consideration in his removal proceedings.  Hartsfield's act of signing the paper preceded any adjudication as there were no parties, proceedings, or live case or controversy at the time she signed the "order."  No judicial act occurred until the probation officer filled in the pre-signed paper with case specific information.  The pre-signed paper, therefore, was signed by Hartsfield in an administrative capacity and she is not protected by absolute judicial immunity.

13

### 3. Hartsfield is not entitled to qualified immunity

Hartsfield contends that, to the extent she is not absolutely immune, she is entitled to qualified immunity.  She is mistaken.

When government officials perform discretionary functions, they are immune from suit through qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Plaintiffs' first amended complaint, accepted as true, has alleged the violation of clearly established constitutional rigths.  As another court has explained, "[t]he right to family integrity has been recognized as a fundamental liberty interest protected by the Fourteenth Amendment." *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 809–810 (W.D. Mich. 2004) (citations omitted).  This "fundamental constitutional right to family integrity extends to all family members, both parents and children." *Id.* at 820 (citations omitted).  In addition, it is clearly established that a parent is entitled to a notice and hearing *prior* to the removal of his or her child, unless exigent circumstances exist. *Kovacic v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 809 F. Supp. 2d 754, 791 (N.D. Ohio 2011) (citation omitted).  The Sixth Circuit has also explained that removing a child from his or her parents implicates the Fourth Amendment rights of both the child and his or her parents. *Pittman v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 650 F.3d 716 (2011).  Accepting as true the allegations in plaintiffs' first amended complaint, they have stated violations of the Fourth and Fourteenth Amendments.  The violations are clearly established.

As Plaintiffs state:

14

Under Defendant Hartsfield's policy there was no process of any kind.  Pursuant to her policy, the on-duty desk clerk simply took the Complaint and Petition and, without any scrutiny of the allegations contained therein, gave DPD and DHS an Order to Place, pre-filled with Defendant Hartsfield's signature.  Neither Judge Hartsfield, nor the probation officer, nor anyone else at the Third Judicial Circuit Court reviewed the allegations in the Complaint or Petition for merit before issuing the order that removed Leo Ratté from his parents' custody.  A reasonable official in Defendant Hartsfield's position would know that the court's failure to subject DPD's Complaint and Petition to any meaningful scrutiny would violate plaintiffs' clearly-established procedural [and substantive] due process rights.

(Doc. 74 at 22–23, Pls.' Resp. Br.) (internal citation omitted).

### 4. The claims against Hartsfield are not barred by the statute of limitations

Finally, Hartsfield argues that the claims against her are time-barred.  Like her other arguments, this too lacks merit.

The parties agree that the statute of limitations under § 1983, which draws from Michigan's personal injury statute of limitations, is three years.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *see also Bisco v. City of Flint*, No. 12-15490, 2013 WL 5775522, at *4 (E.D. Mich. Oct. 25, 2013) ("In Michigan, the three (3) year statute of limitations contained in M.C.L.A. 600.5805(8) is the uniform limitations period applied to Section 1983 claims."), citing *Carroll v. Wilkerson*, 782 F.2d 44, 45 (6th Cir. 1986).  Although state law determines the applicable statute of limitations to be applied, *Wilson v. Garcia*, 471 U.S. 261 (1985), "federal law governs when the statute of limitations period begins to run."  *Potts v. Trooper Hill*, 17 F. App'x 302, 304 (6th Cir. 2001) (citing *Sevier v. Turner*, 742 F. 2d 262, 272 (6th Cir. 1984)).

Generally, under federal law, the statute of limitations in a § 1983 action "commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Potts*, 17 F. App'x at 304 (citation and internal quotation mark

15

omitted); *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991). As another court in this district recently explained:

> Stated differently, "[i]n determining when the cause of action accrues in § 1983 cases, we look to the event that should have altered the typical lay person to protect his or her rights." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 856 (6th Cir. 2003). The Court must therefore look at when the harm in question occurred, guided by the principle that "[a] plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier* [*v. Turner*], 742 F.2d [262, 273 (6th Cir. 1984).

*Bisco*, 2013 WL 5775522, at *4; *see also Hornback v. Lexington-Fayette Urban Cnty. Gov't*, ___ F. App'x ___, 2013 WL 5544580, at *2 (6th Cir. 2013).

Hartsfield contends that plaintiffs' claims accrued on April 5, 2008, when Leo was removed into the custody of DHS. Because Hartsfield was not named as a defendant until December 11, 2012 when the first amended complaint was filed, she argues that the claims against her are barred by the statute of limitation. She is wrong.

Plaintiffs were unaware of the practice and policy allegedly put in place by Hartsfield until taking the deposition of the probation officer who was working on April 5, 2008, Althea Alexander (Alexander). Alexander's deposition was taken on August 29, 2012. Therefore, plaintiffs, exercising reasonable diligence, did not have reason to discover the allegedly unconstitutional practice until taking Alexander's deposition. The first amended complaint was filed less than four months later. The statute of limitations does not apply to bar plaintiffs' claims.

16

## IV. THE DHS DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard – Fed. R. Civ. P. 56

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The revised Rule also provides the consequences of failing to properly support or address a fact:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it; or

17

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

## B. Analysis

Plaintiffs contend that Holbrook and Turner-Royster (the DHS defendants) are liable for their role as supervisors of DHS.  Plaintiffs argue that there are circumstantial facts which suggest that the DHS defendants knew that Hartsfield's form order was not a valid order.  In addition, plaintiffs say that the DHS defendants perpetrated Leo's improper removal by failing to exercise their discretion to allow Leo to be placed with his mother or his aunts.  The DHS defendants are entitled to qualified immunity.[7]

As explained above, when government officials perform discretionary functions, they are immune from suit through qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

---

[7] To the extent Corrigan is sued for damages, she is entitled to sovereign immunity under the 11th Amendment.  *Will v. Dep't of State Police*, 491 U.S. 58 (1989).  The Court will address count I seeking declaratory relief as it relates to Corrigan in a separate decision.

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  If qualified immunity is raised as a defense, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

Here, the DHS defendants were acting pursuant to a facially valid court order when Leo was brought to the Russell Street facility, and when they determined that Leo should be placed in a foster home Sunday morning until a preliminary hearing in family court.  The only role that the DHS defendants played is that they were supervisors at the Russell Street facility, and that they interacted with Leo's family.  They did not pick up Leo from the hospital and transport him to the Russell Street facility.  They were on supervision duty while Leo was at the facility.  Their choice to place Leo in a foster home until the preliminary hearing taken pursuant to a facially valid court order was a discretionary choice that is protected by qualified immunity.  *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (citing *Butz v. Economou*, 438 U.S. 478, 506 (1978)).

Plaintiffs contend that the DHS defendants knew that Hartsfield's form of order was invalid because they were DHS employees for over twenty years and must have had knowledge that the family court had a policy of entering orders without judicial review.  In addition, plaintiffs say that the DHS defendants had full access to Leo's family and could have obtained more information.   However, the DHS defendants testified at their depositions that they believed the form order to be valid.  Plaintiffs' speculation that the DHS defendants should have known that the form of order was invalid because of their long tenure at DHS is insufficient to create a genuine issue of material fact.  Plaintiffs have not proffered any evidence establishing that the DHS defendants knew the form of order to be invalid.

19

In addition, Plaintiffs argue that the DHS defendants could have released Leo to his mother or his aunts. Citing to DHS policy requiring a child to be placed with relatives whenever possible in order to keep the family together, plaintiffs contend the DHS defendants should have released Leo to his mother or to his aunts. However, the order specifically stated that Leo could not be placed in his home, which he shared with both his mother and his father. Moreover, the DHS defendants did not place Leo with his aunts because it was determined that a comprehensive background check was required as they were from out of state. Ultimately, the DHS defendants exercised discretion in placing Leo in a foster home until the preliminary hearing. They are protected by qualified immunity for their discretionary decision, even if the decision was wrong.

## V. CONCLUSION

For the reasons stated above, Hartsfield's motion to dismiss was denied and the DHS defendants' motion for summary judgment was granted. All claims against Holbrook and Turner-Royster are DISMISSED. To the extent that Corrigan is sued for damages, the claims against her are DISMISSED. The case proceeds against Hartsfield. A separate decision relating to count I for declaratory judgment is forthcoming.[8]

---

[8] At the time Leo was removed from his home, the standards and procedures for removing a child in Michigan did not meet minimal U.S. constitutional standards. On June 12, 2012, the statutory scheme for removing children was amended by Public Act No. 163 of 2012 to enhance the standards. Under the enhanced standards Leo would likely not have been placed in a foster home for the weekend. The legislative history to Public Act No. 163 makes this clear. The Senate Fiscal Agency Bill Analysis states in relevant part:

> Michigan law authorizes a law enforcement officer, without a warrant, to take a child into protective custody if the child's surroundings are endangering his or her health, safety, or welfare. The child must be released to his or her parents unless the officer, or a Child Protective Services (CPS) worker, obtains a court order authorizing placement of the child with a relative, in a foster care home, or

11-11190 Leon Ratte v. Corrigan, et al.

SO ORDERED.

 s/Avern Cohn
UNITED STATES DISTRICT JUDGE

Dated:  November 26, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 26, 2013, by electronic and/or ordinary mail.

 s/Carol Bethel for Sakne Chami
Case Manager, (313) 234-5160

---

in a licensed facility, pending an investigation and hearing.  An incident that took place in April 2008 has highlighted apparent shortcomings of the law.  In that case, a man had taken his seven-year-old son to a Detroit Tigers game and purchased a bottle of Mike's Hard Lemonade for the boy, not knowing that the beverage contained alcohol.  A security guard became aware that a child was drinking alcoholic lemonade and took the boy to the ballpark's medical clinic.  He then was transported by ambulance to Detroit Children's Hospital, where a blood test showed no trace of alcohol.  The father was questioned by a police officer, CPS was contacted, and a court order evidently was issued for the child's removal and temporary placement.  Ultimately, the boy spent two nights in foster care before he was released to the custody of his mother, on the condition that his father move out of the house.

Mich. S.F.A. B. An., S.B. 320 (Nov. 29, 2012).

21